**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Robert Seil,                          )
                                      )
        Plaintiff,                    )     Case No. 1:08-CV-701
                                      )
    v.                                )
                                      )
Keystone Automotive, Inc.,            )
<u>et al.</u>,                        )
                                      )
        Defendants.                   )

O R D E R

This matter is before the Court on the motion for
summary judgment filed by Defendants Keystone Automotive, Inc.
and LKQ Corporation (Doc. No. 25).  For the reasons set forth
below, Defendants' motion for summary judgment is **GRANTED IN PART
AND DENIED IN PART.**

I. <u>Background</u>

Plaintiff Robert Seil presents claims against Defendant
Keystone Automotive, Inc. ("Keystone") and LKQ Corporation
("LKQ") for disability discrimination pursuant to the Americans
With Disabilities Act and the Ohio Civil Rights Act, and
interference with his rights under the Family Medical Leave Act,
arising out of the termination of his employment on February 15,
2008.[1]

_____

[1]     Additionally, Plaintiff originally asserted that
Defendants violated the Employee Retirement Income Security Act,
29 U.S.C. § 1140, ("ERISA"), by firing him in retaliation for

1

Both Keystone and LKQ are in the business of selling auto parts, such as hoods, fenders, and radiators, to automobile body repair shops. Barkoukis Dep. at 7-8. Keystone hired Plaintiff in December 2004 to perform the position of inside sales coordinator or "ISC." As an ISC, Plaintiff's main function was to take telephone orders from Keystone's customers. Plaint. Dep. at 32. Plaintiff occasionally performed other duties, such as delivering parts and assisting in warehouse reorganizations. Id. at 33. Plaintiff was based in Keystone's Cincinnati facility.

The parties dispute the practical significance of the next event, but in December 2005, Plaintiff's immediate supervisor, General Manager Randy White, promoted Plaintiff to sales manager. Doc. No. 25-6, at 55. It is not disputed that the sales manager function is different from the ISC function. See, e.g. Doc. No. 25-6, at 56 (Keystone job description listing sales manager's duties). Plaintiff claims, however, that White promoted him in name only as a means to increase his compensation and that his duties stayed the same. In other words, despite an abundance of internal documentation showing that he was promoted to sales manager, Plaintiff claims that in reality he remained an ISC. Plaint. Dep. at 55-56.

_____

filing for and receiving short-term disability benefits. Plaintiff, however, abandoned this claim after Defendants moved for summary judgment. See Doc. No. 29, at 9.

LKQ, a direct competitor, acquired Keystone in October 2007.  Jude Aff. ¶ 3 (Doc. No. 25-5).  LKQ operated a facility on the outskirts of Cincinnati.  As a result of the Keystone acquisition, it was decided to merge LKQ's Cincinnati facility into Keystone's Cincinnati facility.  LKQ Regional Manager Chris Barkoukis was in charge of consolidating the Cincinnati facilities with a mandate from his supervisor, Justin Jude, to reduce head count.  Jude Aff. ¶ 7 (Doc. No. 25-5, at 2).

In early November 2007, Barkoukis convened a meeting at the Keystone Cincinnati office to discuss the process of merging the two facilities.  Barkoukis Dep. at 16.  Attending the meeting from the LKQ side were Barkoukis, Jude, and Terry Gray, who was the general manager of LKQ's Cincinnati facility.  On the Keystone side were Randy White, Chris Courtney, a regional manager, and Jim Pundt, who was vice president of the northeast region.  Barkoukis testified that during this meeting, he determined that there was a redundancy in the general manager position which would be resolved by keeping White as the general manager and essentially demoting Gray by assigning him all of the sales responsibilities for the store, including those duties performed by Plaintiff.  Id. at 33.

Barkoukis, therefore, decided that Plaintiff's position would be eliminated in this consolidation.  In addition to the redundancy in positions, Barkoukis testified that another reason

he decided to terminate Plaintiff was because the Keystone people indicated to him that they were not satisfied with his performance, and in fact, had indicated that they were intending to fire Plaintiff anyway. Id. at 34-37. Additionally, Barkoukis stated that another factor playing into his decision was a story he had heard "on the street" that Plaintiff had cursed at a customer. Id. at 35-36. Barkoukis testified that everyone at the meeting agreed with this decision. Id. at 34-35 (stating that "we decided to let him go at that meeting.") (emphasis added). Barkoukis said, however, that he decided not to inform Plaintiff of his impending termination until he decided whether he still needed Plaintiff's help during the consolidation. Id. at 55. Although Barkoukis claims that he was informed that Keystone was not happy with Plaintiff's performance, Plaintiff's January 2007 performance evaluation rated him a 4 on a scale of 5. Doc. No. 25-4, at 24. Moreover, a number of other attendees of this meeting could not recall any recommendation that Plaintiff be terminated because of the consolidation. Jude Dep. at 27 (Doc. No. 29-6, at 5); Pundt Dep. at 21-23 (Doc. No. 29-8, at 3-5); Gray Dep. at 42 (Doc. No. 29-5, at 12).

Also in November 2007, Plaintiff learned that he had contracted fibrosing mediastinitis. Plaint. Dep. at 13 (Doc. No. 25-6, at 5). Plaintiff's treating physician, Dr. Junaid Malik, described fibrosing mediastinitis, and in particular, Plaintiff's case, as follows:

> Basically, this is a disease where we think it's from
> histoplasmosis, which is a fungus in the soil, but it
> can be from a lot of things, but it is basically where
> there's an immune reaction that occurs inside of the
> body where it causes a cobwebbing effect inside the
> chest, and in particular, Mr. Seil's involvement was
> scarring and closing off of the blood vessels that went
> to the right side of his lung.  It started off in the
> right upper lobe, and that's where his blood was coming
> from, and it had closed off the main blood vessel to
> that lobe.  And what was happening was that he was
> actually–part of that lung was dying off, and that's
> why he was getting blood coming out, coughing up the
> blood.

Malik Dep. at 10-11 (Doc. No. 25-, at 23-24).  The initial
diagnosis of this condition, however, required that Plaintiff
undergo a biopsy which involved surgery for removal of tissue
samples of his lung.  Plaintiff. Dep. at 105-06 (Doc. No. 25-6),
at 47.  This procedure was conducted on December 17, 2007.

Plaintiff's request for FMLA leave was approved for the
period December 17, 2007 through January 25, 2008, but his leave
was extended shortly after his surgery.  Doc. No. 29-11, at 11;
Garrett Dep. at 36 (Doc. No. 29-4, at 2).  During the week of
February 15, 2008 Plaintiff contacted the facility supervisor,
Crystal Garrett, and notified her that he intended to return to
work on February 18, 2008.  Plaint. Dep. at 108 (Doc. No. 25-6,
at 49).  According to Barkoukis, when he learned that Plaintiff
intended to return to work on February 18, he followed up his
November decision by instituting the process of terminating
Plaintiff after verifying that he was not needed at the
Cincinnati facility.  Barkoukis Dep. at 58-59 (Doc. No. 25-3, at

31-32). Because he was on FMLA leave at the time, Barkoukis's request to terminate Plaintiff raised a red flag at Keystone's human resources department. However, Plaintiff's termination was approved after Barkoukis gave assurances that he would have been terminated even had he not been on FMLA leave. Plaintiff was officially terminated as of February 15, 2008. Doc. No. 29-11.

Plaintiff filed a timely complaint for disability discrimination with the EEOC and received a right to sue letter. Amended Complaint ¶¶ 40-41. On August 8, 2008, Plaintiff filed a complaint against Keystone and LKQ for disability discrimination under both federal and state law and for interference with his FMLA leave rights. Also, as indicated, Plaintiff filed a complaint pursuant to ERISA for interference with his short-term disability rights which he has since abandoned.

Defendants filed the instant motion for summary judgment on each of Plaintiff's claims on October 12, 2009. Doc. No. 25. Briefing on Defendants' motion was concluded on December 2, 2009. Accordingly, Defendants' motion is ready for disposition.

## II. <u>Summary Judgment Standard of Review</u>

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party

6

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The evidence presented on a motion for summary judgment is construed in the light most favorable to the non-moving party, who is given the benefit of all favorable inferences that can be drawn therefrom.  <u>United States v. Diebold, Inc.</u>, 369 U.S. 654 (1962).  "The mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)(emphasis in original).  The Court will not grant summary judgment unless it is clear that a trial is unnecessary.  The threshold inquiry to determine whether there is a need for trial is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  <u>Anderson</u>, 477 U.S. at 250.  There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  <u>Id.</u>

The fact that the weight of the evidence favors the moving party does not authorize a court to grant summary judgment.  <u>Poller v. Columbia Broadcasting System, Inc.</u>, 368 U.S. 464, 472 (1962).  "[T]he issue of material fact required by Rule 56(c) . . . to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party

7

asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or a judge to resolve the parties' differing versions of the truth at trial." First National Bank v. Cities Service Co., 391 U.S. 253, 288-89 (1968).

Moreover, although summary judgment must be used with extreme caution since it operates to deny a litigant his day in court, Smith v. Hudson, 600 F.2d 60, 63 (6th Cir.), cert. dismissed, 444 U.S. 986 (1979), the United States Supreme Court has stated that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). According to the Supreme Court, the standard for granting summary judgment mirrors the standard for a directed verdict, and thus summary judgment is appropriate if the moving party establishes that there is insufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Id. at 323; Anderson, 477 U.S. at 250.

Accordingly, summary judgment is clearly proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at

trial." <u>Celotex Corp.</u>, 477 U.S. at 322. Significantly, the
Supreme Court also instructs that the "the plain language of Rule
56(c) mandates the entry of summary judgment, after adequate time
for discovery and upon motion" against a party who fails to make
that showing with significantly probative evidence. <u>Id.</u>;
<u>Anderson</u>, 477 U.S. at 250. Rule 56(e) requires the non-moving
party to go beyond the pleadings and designate "specific facts
showing that there is a genuine issue for trial." <u>Id.</u>

Further, there is no express or implied requirement in
Rule 56 that the moving party support its motion with affidavits
or similar materials negating the opponent's claim. <u>Id.</u> Rule
56(a) and (b) provide that parties may move for summary judgment
"with or without supporting affidavits." Accordingly, where the
non-moving party will bear the burden of proof at trial on a
dispositive issue, summary judgment may be appropriate based
solely on the pleadings, depositions, answers to interrogatories,
and admissions on file.

### III. <u>Analysis</u>

#### A. <u>Disability Discrimination</u>

Counts I, IV and V of the Amended Complaint allege that
Defendants terminated Plaintiff's employment because of
disability in violation of the federal Americans With
Disabilities Act ("ADA"), 42 U.S.C. § 12112, <u>et seq.</u>, and the
Ohio Civil Rights Act, Ohio Rev. Code Chapter 4112.

Federal evidentiary standards and burdens of proof apply to
claims of employment discrimination filed pursuant to the Ohio
Civil Rights Act. <u>Kaltenberger v. Ohio College of Podiatric
Medicine</u>, 162 F.3d 432, 435 (6th Cir. 1998). Therefore, federal
case law applies to Plaintiff's state law disability
discrimination claim. <u>Id.</u>[2] Accordingly, Plaintiff's federal and
state claims may be analyzed together.

In their motion, Defendants argue that summary judgment
on Plaintiff's disability discrimination claims is appropriate
because Plaintiff was not "disabled" within the meaning of the
statutes. Defendants argue that, despite having only one
functional lung, Plaintiff is not substantially limited in any
major life activity, including working or breathing. In
opposition, Plaintiff does not argue that he was actually
disabled, i.e., that his fibrosing mediastinitis actually is a
substantially limiting condition. Rather, Plaintiff contends
that Defendants regarded him as having substantial limitations in
his ability to breath and work. Doc. No. 29, at 22.

---

[2]  There is one caveat. Under the ADA, the plaintiff must
demonstrate that the employer discriminated against him <u>solely
because of</u> his disability. <u>Macy v. Hopkins County Sch. Bd. of
Educ.</u>, 484 F.3d 357, 363 & 363 n.2 (6th Cir. 2007). Conversely,
under Ohio law, the plaintiff is only required to prove that his
disability played <u>at least a part in</u> the employer's adverse
employment decision. <u>Columbus Civil Serv. Comm'n v. McGlone</u>, 697
N.E.2d 204, 206 (Ohio 1998). The Court need not reconcile these
two standards, however, because, as will be explained, Plaintiff
was not "disabled" under either statute.

In order to establish a prima facie case of disability discrimination, the plaintiff must prove that he is "disabled."

"Disability" under the ADA means:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual;

(B) a record of such impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). Under regulations promulgated by the Department of Labor, "physical or mental impairment" means:

(1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or

(2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h). "Major life activities" are "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

In Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999) the Supreme Court explained when an employee is "regarded as" being disabled:

There are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical

11

impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. In both cases, it is necessary that a covered entity entertain misperceptions about the individual-it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting.

Id. at 489. "This part of the Act is intended to allow individuals to be judged according to their actual capacities, rather than through a scrim of myths, fears, and stereotypes accruing around a perceived impairment." Mahon v. Crowell 295 F.3d 585, 592 (6th Cir. 2002) (internal quotation marks omitted). When the major life activity is working, the employee must demonstrate that he was regarded as being unable to work a broad class of jobs. Sutton, 527 U.S. at 491.[3] The Ohio Civil Rights Act imposes the same requirement. City of Columbus Civ.

---

[3] The ADA Amendments Act of 2008, which became effective January 1, 2009, amended § 12102's definition of "disability" in order to overrule the decision in Sutton. In Sutton, the Supreme Court held that in order to be "regarded as" being disabled in the major life activity of working, the plaintiff had to show that he was perceived as being limited from working in a broad class of similar jobs rather than in a single job. Id. at 491-93. The ADA Amendments Act in part is intended to restore a broader scope to the "regarded as" definition of disability. See Pub. L. No. 110-325, § 2(b)(3) (2008). The Sixth Circuit recently held, however, that the ADA Amendment Act does not apply retroactively to employer actions which occurred before its effective date. Mulholland v. Sumner County Bd. of Ed., 569 F.3d 562, 565-67 (6th Cir. 2009). In this case, since the conduct at issue occurred before the effective date of the Act, the prior case law under the "regarded as" prong applies to the major life activity of working.

Ser. Comm'n v. McGlone, 697 N.E.2d 204, 207 (Ohio 1998).

Plaintiff argues that Defendants regarded him as being disabled from working because Barkoukis stated in an affidavit filed with the summary judgment motion that during the period of Plaintiff's FMLA leave, he did not know when or even if Plaintiff would be returning to work. See Barkoukis Aff. ¶ 10 (Doc. No. 25-3, at 47). Plaintiff also thinks that Barkoukis regarded him as being disabled from work because Barkoukis testified that he "put [Plaintiff] in the back of my mind and didn't really think about him" while he was on medical leave of absence. Plaintiff also contends that Barkoukis regarded him as being disabled in the major life activity of breathing because he expressed "shock" at Plaintiff's condition and stated that he believed there were lumps inside of Plaintiff's lungs that would require more testing.

There is nothing in any of these statements from which a reasonable person could conclude that Barkoukis regarded Plaintiff as being unable to work a broad class of jobs because of his impairment or that he regarded Plaintiff as being disabled in the activity of breathing. Plaintiff's first argument relies on the fact that Barkoukis expressed uncertainty about whether Plaintiff would be returning from his leave of absence. Wondering whether a condition is permanently disabling – which is essentially the thought expressed by Barkoukis – is not the same

13

as concluding or assuming that the condition is in fact disabling when it is not. There is nothing at all in this statement that expresses any opinion or thought about Plaintiff's ability to work in a broad class of jobs. Moreover, there is nothing in these statements that indicates that Barkoukis's view of Plaintiff's ability work was colored by myths, fears or stereotypes.

Plaintiff has not cited any similar case in his brief and the Court's own research has not discovered one. Indeed, the plaintiff has a "steep challenge . . . in proving that his employer regarded him as substantially limited in working" because employers typically "do not regularily consider the panoply of other jobs their employees could perform[.]" Cotter v. Ajilon Serv., Inc., 287 F.3d 593, 601 (6th Cir. 2002). While the Court understands that discriminatory attitudes can be subtle and nuanced, in most of the cases in which the employer has been held to have regarded the plaintiff as being disabled, the employer's state of mind was far more discernible than can be gleaned from Barkoukis's statements in this case. For instance, in Ross v Campbell Soup Co., 237 F.3d 701, 709 (6th Cir. 2001), the Court held that the employer regarded the plaintiff, who frequently experienced severe back pain, as being substantially limited in the ability to work where a note in the file referred to the plaintiff as a "problem person" and a "back case." Id. at 704,

707. In <u>Henderson v. Ardco, Inc.</u>, 247 F.3d 645 (6th Cir. 2001), the Court held that the employer regarded the plaintiff as being disabled from working where the plant manager testified that "there is not a job in the plant that her restrictions would not bump into" because it indicated a belief that someone with physical restrictions would not be able to perform factory work. <u>Id.</u> at 651-54. In <u>Moorer v. Baptist Memorial Health Care Sys.</u>, 398 F.3d 469 (6th Cir. 2005), the Court held that the employer regarded the plaintiff as being disabled from working by alcoholism because it believed he could not perform his administrative position, which required a broad range of managerial skills, and because his supervisor stated that his alcoholism would eventually kill him. <u>Id.</u> at 484. In <u>Todd v. City of Cincinnati</u>, 436 F.3d 635 (6th Cir. 2006), the Court held that the employer regarded the plaintiff as being disabled from performing a job as a firearms instructor simply because he had retired from the police department on a disability pension. <u>Id.</u> at 636-38. In comparison to these examples, in this case, no reasonable person could conclude based on the statements at issue that Barkoukis believed that Plaintiff was incapable of performing a broad range of jobs because of a perceived disability.

Finally, the fact that Barkoukis expressed concern and shock about Plaintiff's condition does not demonstrate that he

viewed Plaintiff as being disabled.  See, e.g. Taylor v. Nimock's
Oil Co., 214 F.3d 957, 961 (8th Cir. 2000)("We conclude that
knowing that an employee may be having medical difficulties and
expressing concern, whether through an offer of medical leave or,
as here, sending a 'get well' card, does not amount to treating
an employee as if she has a permanent disability that
substantially limits her life activities.").

　　　　In summary, the record fails to create a triable issue
of fact as to whether Defendants regarded Plaintiff as being
disabled.  Therefore, Plaintiff cannot establish a prima facie
case of disability discrimination.  Accordingly, Defendants'
motion for summary judgment on Counts I, IV, and V of the Amended
Complaint is well-taken and is **GRANTED**.  These claims are
**DISMISSED WITH PREJUDICE.**

## B. FMLA Interference/Retaliation

　　　　Count II of the Amended Complaint alleges that
Defendants interfered with Plaintiff's rights under the FMLA.
The FMLA prohibits employers from interfering with or restraining
any rights provided to employees under its provisions.  29 U.S.C.
§ 2615(a).  There are two types of FMLA interference claim.  The
first is an entitlement claim in which the employer fails to
provide the employee with entitlements provided by the FMLA, such
as reinstatement after taking medical leave.  Edgar v. JAC Prod.,
Inc., 443 F.3d 501, 507 (6th Cir. 2006).  The second is a

retaliation claim in which the employer retaliates against the employee for having exercised his rights under the FMLA. Id. at 508. As the Court understands the amended complaint and the other pleadings, Plaintiff in this case is asserting a retaliation claim rather than an entitlement claim. See Doc. No. 29, at 26-27 (Plaintiff's memorandum in opposition to motion for summary judgment discussing causal connection between adverse action and protected activity).

In order to prevail on an FMLA retaliation claim, a plaintiff must establish that 1) he availed himself of a protected right under the FMLA by notifying the employer of his intent to take leave, 2) he suffered an adverse employment action, and 3) that there was a causal connection between the exercise of his rights under the FMLA and the adverse employment action. Id. at 508. If the plaintiff establishes these elements, the burden shifts to the employer to proffer a legitimate, non-retaliatory reason for discharging the employee. Id. If the employer carries this burden, the plaintiff must show that the reasons advanced by the employer are pretextual. Skrjanc v. Great Lakes Power Serv. Co., 272 F.3d 309, 316 (6th Cir. 2001).

One of the issues raised in the pleadings is whether Plaintiff was terminated in a reduction-in-force, and consequently, whether he is required to adduce additional direct,

17

circumstantial, or statistical evidence that he was terminated for discriminatory reasons.  Geiger v. Tower Automotive, 579 F.3d 614, 623 (6th Cir. 2009).  In turn, resolution of this particular question turns on whether Plaintiff was an ISC at the time of his termination, as he contends, or a sales manager, as Defendants contend.  The Court notes, however, that the additional evidentiary burden placed on plaintiffs in reduction-in-force cases relates to the fourth element of a prima facie case of discrimination, i.e., whether the plaintiff was replaced by someone outside of the protected class.  See id.  The claim now under consideration, however, is a retaliation claim.  As indicated by the Court's recitation of the necessary elements to establish such a claim, Plaintiff is not required to show that he was replaced by another person to prove his prima facie case. Therefore, while the alleged reduction-in-force serves as a legitimate, non-retaliatory reason for Plaintiff's discharge, the Court concludes that it does not impose a heightened evidentiary burden on Plaintiff in order to establish a prima facie case of retaliation.  Consequently, the Court need not resolve the issue whether Plaintiff was actually terminated in a reduction-in-force.

There is no dispute that Plaintiff can establish the first two elements of a prima facie case of retaliation: he exercised his rights under the FMLA and he suffered an adverse

18

employment action.  Defendants, however, argue that Plaintiff

cannot establish a causal connection because Barkoukis made the

decision to terminate Plaintiff before he went on medical leave.

Review of the record, however, finds evidence from which a juror

could conclude that Barkoukis is not being truthful about the

timing of his decision.

Barkoukis claims that he decided to fire Plaintiff

during the November 2007 meeting which took place shortly after

the merger.  As recounted above, however, <u>supra</u> at 4, other

participants at that meeting could not recall any recommendations

being made to terminate Plaintiff.  Moreover, there are no

minutes or other documents in the record that memorialize this

decision.  Therefore, there is an issue of fact about the timing

of Barkoukis's decision to terminate Plaintiff.  Additionally,

the fact that Plaintiff was not notified of his termination until

immediately after he announced his intention to return to work

from leave provides a strong inference of a causal connection.

<u>Mickey v. Ziedler Tool & Die Co.</u>, 516 F.3d 516, 525 (6th Cir.

2008); <u>see also</u> <u>Chandler v. Specialty Tires of Am. (Tenn.), Inc.</u>

283 F.3d 818, 826 (6th Cir. 2002) (finding retaliation where

plaintiff was terminated at the end of her leave).  Accordingly,

the Court concludes that the record establishes a prima facie

case of retaliation.

The Court has already indicated that the reduction-in-

force provides a legitimate non-retaliatory reason for Plaintiff's termination. Thus, the burden shifts to Plaintiff to adduce evidence of pretext. The Court does find that there is evidence from which a juror could conclude that the reduction-in-force was not the true reason for Plaintiff's discharge and/or that it did not actually motivate Plaintiff's discharge. The Court has already highlighted the credibility issues surrounding the timing of Barkoukis's decision. Additionally, Barkoukis's claim that the Keystone people were not satisfied with Plaintiff's performance and were set to discharge him anyway does not square with his recent excellent performance evaluation. Doc. No. 25-4, at 24. Barkoukis also supposedly based his decision on a story that he had heard about Plaintiff cursing at a customer, but his reliance on that story is questionable given that Plaintiff's performance review indicates he got along well his customers. Id. at 23; see Smith v. Chrysler Corp., 155 F.3d 799, 808-09 (6th Cir. 1998) (stating that where "the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process "unworthy of credence," then any reliance placed by the employer in such a process cannot be said to be honestly held."). It is also unusual that after he supposedly decided to terminate Plaintiff, he sought out Plaintiff's opinion about Randy White's performance as the new general manager.

Barkoukis Dep. at 46-47 (Doc. No. 29-2, at 21-22). If Barkoukis actually perceived Plaintiff to be a poor performer, it makes little sense that his opinion about another person's performance would hold any value for Barkoukis. The Court concludes that this evidence is sufficient, when coupled with the elements of the prima facie case of retaliation, for a juror to conclude that Defendants' articulated reason for terminating Plaintiff is false and that retaliation was the real reason. <u>Reeves v. Sanderson Plumbing Prod., Inc.</u>, 530 U.S. 133, 148 (2000); <u>see also</u> <u>Peck v. Elyria Foundry Co.</u>, No. 08-3301, 2009 WL 2868831, at *5 (6th Cir. Sept. 8, 2009)("[A]t the summary judgment stage, a plaintiff may meet her burden of demonstrating pretext by showing, in addition to proffered evidence, that an employer's reasons are so incoherent, weak, inconsistent, or contradictory that a rational jury could conclude the reasons were not believable.").

Defendants point out that other employees under Barkoukis's supervision took FMLA leave and were not terminated. Thus, Defendants argue that Plaintiff's showing of pretext is undermined. While this fact may undermine the evidence of pretext, it is not dispositive of the question and is not sufficient in itself for Defendants to prevail on summary judgment. At bottom, this evidence tends to bolster the credibility of Barkoukis's explanation for terminating Plaintiff. Credibility issues, however, cannot be resolved on summary

judgment.  As stated, there is sufficient evidence of pretext to submit the issue to a jury.

Accordingly, for all these reasons, Defendants' motion for summary judgment on Plaintiff's FMLA retaliation claim is not well-taken and is **DENIED.**

Conclusion

In conclusion, for the reasons stated, Defendants' motion for summary judgment is well-taken and is **GRANTED** as to Counts I, III, IV and V of the Amended Complaint.  Those claims are **DISMISSED WITH PREJUDICE.**  The motion for summary judgment is not well-taken and is **DENIED** as to Count II of the Amended Complaint.

**IT IS SO ORDERED**

Date January 6, 2010                s/Sandra S. Beckwith
                          Sandra S. Beckwith
                  Senior United States District Judge